**In re the Marriage of Jan MILLIGAN f/k/a/Helmstetter, Appellant–Respondent,**

v.

**Carl HELMSTETTER, Respondent–Appellant.**

**Nos. WD 55619, WD 55649.**

Missouri Court of Appeals,
Western District.

Feb. 29, 2000.

Rehearing Denied May 2, 2000.

16

Nancy A. Beardsley, Blue Springs, for Appellant-Respondent.

Gail Berkowitz, Kansas City, for Respondent.

Before: Presiding Judge SPINDEN, Judge LOWENSTEIN and Judge ULRICH.

HAROLD L. LOWENSTEIN, Judge.

### FACTS

This appeal emanates from a post-dissolution modification of maintenance and certain other orders. Jan Milligan Helmstetter (Jan) appeals the judgment entered after Carl Helmstetter (Carl) filed a motion to modify the amount of maintenance he was paying to Jan. Intertwined in this action is the motion court's ruling on Jan's subsequent motion for Carl to show cause why he was not making house payments. Also consolidated in this case were Carl's issues that Jan had unduly delayed the sale of the parties' house and summer home. Carl has cross-appealed. The reader is advised there were four children of this marriage. There have also been numerous changes in their custody which indirectly affect the root issue here—modification of maintenance and the ultimate disposition of sale proceeds of real estate, which followed a long period of inaction, while debts, including IRS debts, mounted.

In addition to retroactively modifying the amount of Carl's maintenance obli-

gation to Jan, the motion court also set a prospective date for termination. It further ordered reimbursement to the parties for certain debts from the sale proceeds of two marital homes, distributed the remaining proceeds of the sale, and dismissed contempt charges brought against respondent.

Appellant Jan and respondent Carl were married for almost 23 years when their marriage was dissolved after a hearing before an arbitrator which took place in October and November of 1992. The arbitrator's Findings of Facts, Conclusions of Law and Arbitration Decision were confirmed by the court in May 1993. The decree will be summarized in pertinent part.

Carl and Jan spent their married life in Kansas City, Missouri, where Carl was, and still is, a senior partner of a law firm, while Jan was a homemaker to their four children. At the time of dissolution Carl had custody of one son. Carl ultimately obtained custody of the other two sons, while the youngest daughter remained with Jan. The daughter was born with certain developmental abnormalities, making her a slow learner, though the arbitrator found that her care was not a substantial obstacle to Jan's future ability to work full time and support herself.

At the time of the dissolution, the parties owned two marital residences: one in Kansas City and one in Michigan. The Kansas City home was subject to a mortgage and deed of trust which had a balance of $80,560.00, as well as a second mortgage which was a revolving line of credit and deed of trust with a balance of $198,500.00. Both mortgage payments on the Kansas City residence equaled $4,200.00 per month. Additionally, the parties owned a vacation home in Michigan subject to a mortgage and deed of trust with a balance of $166,664.00, and monthly payments of $1,400.00. At the time the marriage was dissolved, the arbitrator found that the parties were in dire financial straits as they had been living well

beyond their means long before the dissolution.

Prior to the 1992 arbitration, the parties entered into a Joint Stipulation and Agreement that was incorporated into the May 1993 order of the court. The parties had agreed that the two residences were to be promptly sold to satisfy all existing obligations the parties owed, and the proceeds of sales would be distributed according to the schedule set by the arbitrator. The remaining proceeds were to be awarded 60% to Jan and 40% to Carl. While the sales were pending, Carl agreed to and was ordered to pay all mortgage and indebtedness for both properties, recovering any principal balance reduction when the sale proceeds were eventually divided.

Additionally in the court order of May 1993 confirming the arbitrator's finding and conclusions, Carl was ordered to pay modifiable maintenance in the amount of $1,931.00 per month until the Kansas City residence sold, and at that time the amount would increase to $2,800.00 per month. (Carl had been voluntarily paying $3,000.00 per month in child support before the dissolution while the parties were separated.) However, neither residence sold until 1995: the Michigan residence selling in May of 1995, and the Kansas City residence selling in December of 1995. The majority of this appeal deals with the parties' conduct relating to the sales of the two residences. Facts included in the following recitation are taken from the judgment under review which was rendered in February, 1998.

In May 1993 when the marriage was dissolved, Carl was ordered to pay the mortgages, which he did consistently until late 1994. In June 1994, Carl filed a motion to modify to reduce maintenance based in part on his inability to provide a home and support for the three boys and because Jan would not step down as realtor for the residence or take active steps in getting the houses sold. His income had declined, his taxes went unpaid and he did

not have money to pay the mortgages on the unsold homes. He stopped paying the Michigan mortgage in December of 1994 after missing two payments in late 1994. He made his last payment on the Kansas City house in December of 1994 after missing one to two payments in late 1994. Further, Carl borrowed against the revolving line of credit and did not pay back $10,845.50 of principal. Although Jan objected that this was part of the mortgage pay-off to be split 60/40, Carl testified that the order did not prohibit him from continuing to draw on the line of credit.

Carl stopped making payments on the second mortgage line of credit in January of 1995. Ultimately, foreclosure proceedings were initiated on both residences in an action for collection of the line of credit. Jan hired counsel and was successful in stopping the foreclosure proceedings until the Kansas City residence sold. However, in order to do this, the parties were required to pay the first and second lien holders the entire balance of the net proceeds of the Michigan residence when it sold. Under the initial court order, had those proceeds not been used to avoid foreclosure on the Kansas City residence, they would have been split 60/40 between the two parties.

When the Kansas City residence finally sold, the balances of the first and second mortgages due to the lien holder were $80,814.49 and $210,937.02 respectively, which were both paid in full from the sale proceeds. Both of the balances included principal, interest, late charges, and the lenders' attorney fees resulting from the foreclosure proceedings. The remaining balance of the sale proceeds was placed in escrow pending a trial court decision.

Jan filed a motion asking for a lien against Carl's share of the proceeds for the amount in which she was damaged by Carl's refusal to pay the mortgages. The motion was denied by the trial court as the original order had adopted the parties' Stipulation and Agreement which stated that all late fees, attorney fees and foreclo-sure costs associated with the two properties were to be paid from the sale proceeds.

The financial positions of the two parties are relevant to the trial court's order and the issues on appeal. Carl testified that he was not able to meet the court ordered obligations due to his financial status at the time he quit paying the mortgages. His failure to pay was attributed to his decreased income, his costs in caring for the three children in his custody, his maintenance and child support payments to Jan, and most importantly, the unexpected duration of time in which the two residences were on the market. As noted in the introductory paragraph, Carl's payments of income tax fell delinquent, resulting in substantial tax obligations for 1992 and 1993.

It was anticipated that both homes would be sold in a short time. Jan continued to live in the house and use the summer home herself and to rent it out on a limited basis. She did not account for expenses, upkeep, or the rental income from the Michigan house. Even though her maintenance would increase when the properties sold, she, as an owner and agent, allowed the houses to stay on the market for approximately three and a half years, while Carl continued to make payments until financial resources forced him to quit making them in December 1994. The court found the unpaid tax problems of 1992 and 1993 were attributable to Jan's failure to effectuate the eventual sales of the properties.

After the dissolution, the parties agreed to file joint 1992 tax returns with Carl taking full responsibility for the tax liability in order for him to benefit from filing with a married status. However, after Carl paid the full amount, he later received reimbursement for the amount of the 1992 tax obligation from the trial court through the sale proceeds. Subsequently, Carl did not pay any of his individual taxes for the years after 1992 and, as a result, by the

time of the October 1998 modification hearing he owed $180,387.04. A large part of this tax liability was due to the capital gains from the 1995 sale of the residences which the court ordered the parties to split evenly. Jan paid her half of the gains taxes. Carl testified that he failed to make the tax payments because the money was used to pay the three mortgages. Carl also sold almost 90% of the non-marital assets awarded to him in order to meet his financial obligations. At the modification hearing he had less than $10,-000 of income producing assets left. Carl had worked out a payment arrangement with the Internal Revenue Service to take care of his debt. Carl estimated his average monthly living expense to equal $10,-531.23.

The motion court found Carl's yearly income at the time of the 1992 arbitration hearing to be $196,000, but it had fallen to $140,000 in 1994 when the motion to modify was filed. His income for 1996 was $140,000 with the same amount projected for 1997. Jan had been selling real estate for J.D. Reece since 1989. Her reported earnings working part-time for only nine months in 1997 were over $30,000, and the judge specifically found that she could meet her reasonable needs if she worked full time, which she had made no effort to do. Jan received maintenance and child support from Carl in the amount of $3,000 until the order of modification, which lowered the amount to $2,465.62. Jan filed an income and expense statement claiming an average monthly living expense of $6,980.33 which the trial judge found to be embellished and not credible. In fact, the trial judge set out an itemized list in his Finding of Facts and determined Jan's monthly expenses to be only $3,290, less than half of what she claimed as her average monthly expenses. The court specifically found that Jan's reasonable expenses had decreased and that her income and potential for income had increased since the 1992 dissolution. The court further found that Jan's claimed expenses for the care of her daughter were exaggerated,

and that Jan's custody of her daughter did not prevent her from working full-time.

Further, the trial judge found that Jan's habit of frequenting Kansas City area casinos could not be ignored. Although Jan testified that her winnings and losses broke even, the trial judge found her testimony unbelievable. Jan reported winnings of $16,782 in 1996, and at the time of trial in 1997, she had already documented gambling winnings of $12,700. However, Jan's testimony was found to be incredible, as she could not state the amounts of any losses she claimed to offset her winnings. Most significantly, the judge stated that she was unable to explain where and how she spent these substantial winnings. The court also determined, "[T]he significant time [Jan] spends at the casinos" rendered her testimony about needing more time to spend with her daughter and less time for employment, "not credible." The judge further noted that Jan's purchase of a new luxury automobile for herself shortly before the trial with a $600 monthly payment also indicated that she "has more money available than necessary to meet her reasonable needs."

Overall, the trial court judge's modifications were based on the following findings: Carl's income had decreased due to no control of his own; he had accumulated great debt in order to meet his financial obligations stemming from the dissolution; and had made honest efforts to pay his obligations. Further, Jan could earn enough money to meet her reasonable needs if she worked full-time, which she had never done. She had a significant increase in income working only part-time; she had failed to seek any other employment; and she had an office at home as well as at J.D. Reece allowing flexibility to work and care for her daughter at the same time. Additionally, she had spent an appreciable amount of time vacationing in Michigan over two summers rather than working. The judge further found that Jan would have additional substantial

funds available to her from her IRA at the age of 59½. The trial court concluded that Carl had plead and proved a substantial change in Jan's net income and a parallel decrease in Carl's net income.

The judge's final order decreased maintenance retroactively, although he did not order Jan to pay back the overpaid amounts she had already received. He further ordered her maintenance to terminate when Jan reached the age of 59½. In sum, the judgment of February 1998, reduced maintenance from $1931 per month to $1000 per month, retroactive (but not requiring any repayment by Jan) to January 1, 1996, and to terminate no later than Jan's turning 59½ based on her May 7, 1943 date of birth. Further he distributed about 80% of the escrow funds to Carl. The judge also noted that the February 1993 Arbitration Decision had ordered "the two houses should be sold promptly" and did not anticipate that Carl would be making mortgage payments for an extended period while Jan enjoyed the use of the houses.

With regard to both houses, the evidence from the arbitration hearing in conjunction with the dissolution through the findings at this modification hearing established: a) Carl made the payments on both residences with the understanding they would both be sold sometime soon after November 1992; b) since Jan was a real estate broker she would be better able to effectuate quick sales; c) Jan delayed listing either property and then delayed allowing anyone to aid her in marketing either residence; and d) her continued living in the Kansas City residence for some three years while using the "upper bracket vacation house" during the summers without accounting for the times she rented the vacation house led to Carl's nonpayment of federal tax moneys and to his cessation of the mortgage payments themselves. Additionally, the 1992 tax liability was ordered reimbursed to Carl from the escrowed house sale with an offset of Carl's individual 1993 taxes. More specific facts relating to the tax's implementation on the judgment will be included in Jan's point on that issue.

## STANDARD OF REVIEW

"The decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.1976). Credibility of witnesses and weight to be given their testimony is a matter for the trial court, which is free to believe none, part or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585 (Mo.1988). The trial court's findings on witness credibility and weight are never reviewable by the appellate court. *Adams v. Am. Paving & Construct. Co.*, 488 S.W.2d 283 (Mo.App.1972). The trial court may make reasonable inferences from the facts before it and such deserves the appellate court's deference. *First Nat'l Ins. Co. of Am. v. Clark*, 899 S.W.2d 520 (Mo.1995).

### JAN'S APPEAL

### POINTS RELIED ON

I. **Failure to Plead and Prove Substantial and Continuing Change of Circumstances**

Jan first contends that the trial court erred in failing to dismiss Carl's motion to modify the original maintenance order because his pleading did not sufficiently allege, and his evidence failed to show, a substantial and continuing change of circumstances that makes the prior award unreasonable.

The statute controlling the modification of maintenance proceedings is § 452.370, RSMo, 1994, which requires the requesting party to show that there have been changed, substantial and continuing circumstances that make the prior award un-

reasonable. Although Jan makes it clear that an increase in the recipient spouse's income alone is not enough to warrant modification, that is only one factor of the several in the case at bar. *See Sprouse v. Sprouse*, 969 S.W.2d 836 (Mo.App.1998); *Theilen v. Theilen*, 911 S.W.2d 317 (Mo. App.1995). Likewise, Jan also points out that a decrease in the payor spouse's income by itself is similarly not enough to warrant the modification of maintenance. *See Moseley v. Moseley*, 744 S.W.2d 874 (Mo.App.1988). Again, these points are each still only one of the several factors Carl has raised in support of his motion for modification.

Carl produced evidence showing that his income had involuntarily decreased since the time of the original order due to the nature of his law practice. He had depleted his non-marital assets, had incurred substantial tax liabilities by using his money to pay the mortgages and fulfill his court-ordered financial obligations, and he decreased his and his children's living expenses.

Alternatively, Jan's reasonable living expenses were significantly less than the expenses reflected at the time of the original hearing. Her claimed expenses were inaccurate as they related to her daughter and unreasonable in other respects. She also failed to make reasonable efforts to live within her means or to seek employment that would provide her with greater income, and she failed to prove that she works full-time. The trial court also found Jan had overstated her business expenses. The court further found that Jan has more funds available to her than she stated, and that her gambling both creates additional funds at her disposal and takes up time that she claims is needed to care for her daughter. Jan's income had increased, and her ability to better utilize her time and money had increased while Carl's net income had decreased. *Campbell v. Campbell*, 825 S.W.2d 319, 321–22 (Mo. App.1992).

More importantly, the parties agreed to let Jan be the real estate agent responsible for selling the two residences so that she could gain the sales commission. However, Jan failed to sell either of the houses for close to three years. Carl attempted several times to replace Jan with an independent agent to market the Kansas City residence, but she refused and continued to live in the house herself. The Michigan house was also listed by an agent who Jan picked and with whom Jan alone had sole communication. The trial judge found that Jan did not put forth reasonable effort to rent the Michigan house, and when she did she used the income herself rather than applying it to the mortgage payments.

■ All of these factors combined result in the affirmation of the trial court's finding that there were continuing and substantial circumstances that made the original order of maintenance unreasonable. A recipient spouse is under a duty to find work and become self-sufficient as quickly as possible. *See Gerecke v. Gerecke*, 954 S.W.2d 665 (Mo.App.1997); *Eckstein v. Eckstein*, 748 S.W.2d 945 (Mo.App. 1988). A recipient spouse is not permitted to benefit from inactions, but is under a duty and must use his or her best efforts to become self-supporting as soon as possible. *See Oldfield v. Oldfield*, 767 S.W.2d 134 (Mo.App.1989); *Lamont v. Lamont*, 922 S.W.2d 81 (Mo.App.1996). *Markowski v. Markowski*, 736 S.W.2d 463 (Mo.App. 1987), states;

> [D]ependency of a spouse is not to be presumed but self-sufficiency is to be encouraged. Justice does not require provision of support to a spouse who is or may be prepared to become self-supporting. *The failure of the supported spouse to make a good faith effort to seek employment and achieve financial independence within a reasonable time may form the basis for modification of a maintenance award.* (emphasis added).

Jan did not use reasonable efforts to become self-sufficient, while Carl depleted his financial resources to meet his court-ordered obligations. Considering all of the factors together, Carl both plead and proved continuing and substantial changes needed for a modification of maintenance. Point denied.

## II. Insufficient Evidence to Warrant a Reduction of Jan's Maintenance

█ Jan next contends that the trial court erred in reducing her amount of maintenance because all of the evidence indicated she was unable to meet her reasonable needs through property or employment. This point relates back to the discussion above in point I. The trial judge found Jan was fully capable of full-time employment, but had chosen not to work full-time. The court also found Jan's ability to work full time was not impeded because of having custody of her daughter. This combined with her additional financial assets, such as gambling winnings, indicated that if she worked full-time or sought other employment, than she would be able to meet her reasonable needs even with her reduced amount of maintenance. Consequently, the trial judge did not err in reducing Jan's maintenance. Point denied.

## III. Prospective Termination of Maintenance

█ Jan next contends the trial court erred in terminating her maintenance prospectively to when she turns 59½ as there is insufficient evidence that her financial circumstances will be significantly different in the foreseeable future. She further claims that there is no authority allowing a trial judge to prospectively terminate maintenance when it was not limited in the original order.

Jan will have the legal right to draw funds from her IRA, equaling $146,000, without penalty when she reaches the age of 59½, which is the year 2002. This is more than mere speculation that her financial position might have significant change in the future, since the IRA currently exists and was created from Jan's marital share of Carl's retirement account.

Caselaw supports awards of maintenance being of limited duration when "the trial court has before it evidence of some impending change in the financial conditions of the parties, or at least some reasonable expectation that such a change will occur." *Estes v. Estes,* 767 S.W.2d 370, 372 (Mo.App.1989). Courts have further affirmed the prospective termination of maintenance at the time the recipient spouse qualified for Social Security benefits. *Id., see also Zillner v. Zillner,* 875 S.W.2d 585 (Mo.App.1994); *Reeves v. Reeves,* 768 S.W.2d 649 (Mo.App.1989). The trial judge further concluded that there was reasonable expectation that Jan would be working full-time as a real estate agent by the year 2002 which would even further support the prospective termination of maintenance.

█ Jan's contention that caselaw does not support the prospective termination of maintenance in a modification proceeding is without merit as the trial court is vested with broad discretion in determining the duration of a maintenance award and appellate courts don't interfere with that judgment without an abuse of discretion. *See In re Marriage of Clarke,* 950 S.W.2d 11 (Mo.App.1997); *Rich v. Rich,* 871 S.W.2d 618 (Mo.App.1994). The caselaw cited by Jan is distinguishable from the facts in the case at bar. In particular, the Polen case is distinguishable as the recipient spouse did not yet have a degree and the court held there was no proof she would have the degree and have a job by the termination date. *Polen v. Polen,* 886 S.W.2d 701 (Mo.App.1994). In the facts at hand, not only does Jan have a job and a real estate license, but she is also absolutely guaranteed the funds when she reaches the age of 59½. There is no contingency on the future availability of the funds in the situation at bar. The funds are available in the year 2002.

Jan finally argues that there is no proof that she will be retired when she turns 59½. This argument is without merit as there is no requirement that Jan be retired in order to draw funds from the IRA. The trial court committed no abuse of discretion in holding Jan's present income of over $30,000 from part time employment, coupled with the guaranteed income from the IRA, as sufficient to meet her reasonable needs. Point denied.

## IV. Reimbursement Issues: 1) a $15,000 Loan and 2) Cost of Repairs to Residences

In this point Jan asserts the motion court impermissibly amended the portion of the 1993 court order which dealt with reimbursement of the parties from the proceeds of the sales of the two houses. Both sides in their respective motions now under review had asked for the following two determinations: 1) payment of other existing loans related to the homes, and 2) costs of repairs made on the homes.

■ This point is based on the judge's discretion concerning witness credibility. Jan claims that the trial judge's holding that Carl was to be reimbursed $15,000.00 for a debt listed under the original Joint Stipulation and Agreement was error because the parties had agreed in a subsequent modification the debt would be deleted from that Agreement. Carl claims that he never agreed to delete the debt, and as such should be reimbursed. All debts that the parties agreed to delete (and therefore not subject to reimbursement) were initialed by both Carl and Jan on the Agreement, except the disputed $15,000.00 loan from Commerce Bank, which was only initialed by Jan. Apparently this loan was taken out by Carl and related to one of the houses.

■ The trial judge heard evidence from both parties, and believed Carl rather than Jan. The court believed Carl's testimony that the parties did not mutually agree to delete the loan from the Agree-

ment. As such, this court has no authority to reverse that decision. The trial judge has absolute discretion as to the credibility of witnesses and the weight of their testimony is a matter for the trial court, and its findings on witness credibility are never reviewable by the appellate court. *Herbert*, 757 S.W.2d at 585 (Mo.1988); *Adams*, 488 S.W.2d at 285 (Mo.App.1972).

■ Jan's second argument under this point contends that she should be reimbursed over $14,000.00 for improvements she made to the Michigan house in preparation for selling that residence. Although it is true that the original decree ordered reimbursement from the sale proceeds for "the costs of any repairs to the two homes necessary to sell the properties," this point also came down to witness credibility that was under the trial judge's sound discretion.

During the trial, Jan offered into evidence only a summary listing of the repairs for which she was claiming reimbursement. Carl objected as the listing was not supported by any documentation of the expenses. The court sustained the objection and granted Jan leave to submit back-up documentation to her claimed expenses. However, after Jan submitted further documentation intending to cure the deficiencies, the trial judge concluded that neither party would be reimbursed for repairs made to either home. Again, this was within the judge's discretion as he did not believe Jan's expenses were necessary or that her testimony was credible. See *Herbert*, 757 S.W.2d at 585 (Mo.1988); *Adams*, 488 S.W.2d at 285 (Mo.App.1972). The judge did not modify the original decree, but rather found that Jan's expenses were not documented properly, were not necessary as required by the original decree for reimbursement, and that her testimony was not credible. In sum, he did not believe Jan. Point denied.

## V. and VI. 1992 and 1993 Income Tax Liabilities

This court consolidates Appellant's points V and VI into one discussion as it

appears that both problems arose out of the fact that the two residences did not sell as quickly as contemplated by the original agreement and order.

The original agreement and subsequent 1993 order of the division of property did not address the parties' 1992 income tax liability. The record reflects that pursuant to Carl's request, Jan agreed to file the parties' 1992 income taxes under a married status in return for Carl's agreement to be liable for the full amount of the taxes. This was purely to benefit Carl since his income alone made up the taxable amount that year. Jan's agreement enabled him to file under a "married" status rather than "married filing separate," as the latter would place him in the highest tax bracket possible. Jan would have had no plausible reason to agree to do this for Carl unless he promised to pay the tax liability in full. It would have had no effect on Jan's income taxes if she had not agreed to file under a "married" status. Either way, Jan had no taxable income in 1992.

Jan's argument hinges on the fact that although Carl did subsequently pay the entire income tax amount due in 1992, which equaled $57,269.16, he then asked for reimbursement for this amount from the proceeds of the sale of the residences before the parties received their prospective 60/40 shares. In essence, he asked Jan to pay 60% of the 1992 tax liability rather than paying the entire amount himself pursuant to their prior agreement.

Subsequently, and also at issue here, is Carl's individual 1993 income tax liability of $42,466.98 which was automatically taken by the IRS from the proceeds of the sale of the Michigan residence. There is no dispute that this was Carl's liability he incurred after the marriage was dissolved, yet because of his delinquency, the IRS had a lien on the Michigan property and received that amount from the proceeds of the sale. Jan's sixth point argues that this also unjustly subtracts from her 60% share of the proceeds she would have received had Carl not individually been delinquent in his taxes.

In order to settle all of the disputes at hand, the trial judge ordered the 1992 tax liability ($57,269.16) to be taken from the proceeds, while offsetting that amount by Carl's 1993 personal tax liability ($42,-466.98), resulting in a net reimbursement to Carl of $14,802.15.

Beginning this analysis with the 1992 tax liability, this court finds that the trial court erred in taking that amount from the sale proceeds as it was not included in the original property distribution order. Missouri law has consistently held that the appropriate remedy for allocating undistributed property when the issue is raised after the original order has been made final is to bring a separate suit in equity. *See Iverson v. Wyatt,* 969 S.W.2d 797 (Mo. App.1998); *Gehm v. Gehm,* 707 S.W.2d 491 (Mo.App.1986); *Chrun v. Chrun,* 751 S.W.2d 752 (Mo.1988).

Although caselaw has noted that only omitted marital property, not debt, has been allocated in a separate equity action, the exact question has not been addressed by Missouri courts. *See Ludlow v. Ahrens,* 812 S.W.2d 245 (Mo.App.1991). Other jurisdictions have held that the same rules of fairness and equity applying to the equitable division of marital property also apply to the division of marital debt. *See Hardy v. Hardy,* 311 S.C. 433, 429 S.E.2d 811 (App.1993); *Hickum v. Hickum,* 320 S.C. 97, 463 S.E.2d 321 (App.1995).

In *Vehlewald v. Vehlewald,* 853 S.W.2d 944, 950 (Mo.App.1993), the role was discussed that the trial court may assume in apportioning the parties' shares of marital debt:

> Trial courts are not obligated to allocate marital debts. It, however, is a commendable practice and serves to eliminate future dissension between the parties. Debts of the spouses are not marital property. However, the existence of the debt and who has the responsibility for paying the same is a

factor the trial court should consider in a fair division of the marital property. (citations omitted).

As such, this court holds that, just like property, omitted marital debt, discovered both after the original division decree has become final and appeal is no longer possible, may only be distributed in a separate action of equity.

■ In the case at hand, Carl has not filed a separate action of equity concerning the omitted 1992 income tax liability. Therefore, the trial court improperly reimbursed Carl in the amount of $57,269.16 from the undivided gross sale proceeds. Point V is reversed.

The reversal of the 1992 income tax liability consequently affects the trial judge's allocations of Carl's 1993 tax liability. The trial judge set off the 1992 tax liability with Carl's 1993 tax liability, which was automatically taken from the gross proceeds of the Michigan residence. In essence, Carl owed this 1993 debt individually, which the trial court acknowledged by setting off the 1992 amount. So as of the reversal of the 1992 tax liability, there is nothing from which to set off the 1993 liability. Therefore, the $42,466.98 1993 tax liability also has to be credited to the gross amount of proceeds to ultimately be divided 60/40 between the two parties.

As a result of points V and VI, Jan is correct that Carl was entitled to no reimbursement from the house sales funds. The house proceeds are credited with both the 1992 and 1993 tax liabilities, totaling $99,736.14, which 60% of will go to Jan. Points V and VI are reversed accordingly, and the result will be summarized at the end of this opinion.

## VII. Jurisdiction of Clarification Judgment

The following events are set forth to render an understanding of Jan's final point; 1) February 2, 1998 – the trial court enters judgment of modification which includes reducing maintenance from $1931 to $1000 per month effective January 1, 1996 through January 31, 1998, but not requiring Jan to reimburse overpayments she had received; 2) February 19, 1998 – Carl files: a) motion for clarification to modify the judgment to state that the tax treatment which had been in place (i.e. that maintenance payments were to be deductible by him and taxable to Jan) would continue and any overpayment during that period or new payments henceforth could retain that tax status, and b) by separate motion nunc pro tunc changes in figures including an increase of $173 to Jan for disbursement; 3) on February 27, 1998 the court amends judgment by granting Carl's nunc pro tunc motion; 4) on May 26, 1998 Jan files her notice of appeal; and 5) on May 27, 1998 the trial court rules in Carl's favor on the clarification motion.

■ In this point, Jan finally argues that the trial court did not have jurisdiction to clarify its judgment on March 27, 1998, because Jan had filed her notice of appeal on March 26, 1998, before the order was ruled upon. She further argues that there was no jurisdiction to rule on the clarification motion because all remaining post-trial motions were deemed overruled as of February 27, 1998, when the court ruled on Carl's nunc pro tunc motion.

Jan filed her notice of appeal prematurely in that it was filed within the 30–day period in which the amended judgment entered on February 27, 1998, remained under the trial court's control. Pursuant to Rule 75.01, the premature notice was deemed filed immediately after the judgment became final and the period of the trial court's control is not shortened by the filing of a notice of appeal.

Jan's second argument seems to rely on the following language in ■ Rule 81.05(b) which defines finality when there are after-trial motions:

Authorized after-trial motions shall be treated as, and as a part of, a new trial motion for the purpose of ascertaining the time within which an appeal must be

taken, and all such after-trial motions shall be disposed of at the same time. Any authorized after-trial motion not ruled on at the time the motion for a new trial is determined shall be deemed overruled as of the same date.

Carl's motion for clarification was not deemed overruled by the February 27, 1998, motion for an order amending the judgment because the nunc pro tunc motion is not classified as an "authorized after-trial motion." *Dept. of Labor & Indus. Relations v. Woods Mechanical, Inc.*, 926 S.W.2d 537 (Mo.App.1996). Therefore, Carl's February 19, 1998, motion for clarification was not deemed overruled by the judge granting his motion for an order amending the judgment. Further, the court rules that Jan had at no time contested the tax implications set out in the clarification motion. Point denied.

### CARL'S CROSS APPEAL

Carl brings a cross-appeal claiming that if this court decides the trial court erred in its ruling regarding the distribution of sale proceeds, then the trial court also erred by failing to require Jan to repay to Carl the amount she received in excess of the retroactively reduced maintenance. Carl bases his cross-appeal on the premise that the trial judge distributed the sale proceeds according to the several factors discussed in Jan's points on appeal, and if any distributions are now changed, then the overall distribution should be reevaluated.

The trial court did not order Jan to reimburse Carl for the amount of maintenance he had overpaid her when the amount was lowered retroactively. The trial court's judgment distributing the sale proceeds stated that as a rationale in the distribution, "that any overpayments of maintenance from Respondent to Petitioner have been taken into consideration in the division of the sale proceeds hereinafter."

Carl's maintenance payment was decreased by $931.00 per month and was lowered retroactively for 25 months. This resulted in an amount of approximately $23,275.00 that was not ordered reimbursed by Jan to Carl that he had overpaid her in the previous years.

By ruling in Jan's favor on points V and VI of her appeal, this court has determined Carl should not have been allowed $99,736.14 from the sales proceeds for his taxes. Likewise, under Carl's point on cross-appeal, it is evident the trial court felt the scheme it relied upon was fair only if Jan were not required to repay the sum of $23,275 in excess maintenance.

In the interest of judicial economy and in an effort to bring this lengthy and unhappy proceeding to a close, this court orders the tax amount of $99,763 not be reimbursed to Carl from the sales proceeds. Having concluded it was error to reimburse Carl for his tax obligations, and it was improper to take that amount off the top of the escrowed sales proceeds, the result is the trial court's scheme has been altered and as a result, provisions must be made for the arrearage on maintenance. The only recourse is to amend the judgment to require Jan to pay Carl $23,275 from the overpayments of her retroactively reduced maintenance.

### CONCLUSION

The judgment of the trial court is affirmed except as to a) the portion which allowed Carl to recover $99,763.14 from the sales proceeds before distribution for his 1992 and 1993 taxes, which is modified so the credits to Carl are negated and the amount of $99,763.14 is put back in the balance of the predistribution account, and b) that portion of the judgment which did not require Jan to repay the excess amount of maintenance. That portion is reversed and a judgment against Jan is entered in the amount of $23,275 for repayment of retroactively reduced maintenance. After such adjustments are made, the remaining balance is to be divided 60%

to Jan and 40% to Carl. Costs to be divided equally.

All concur.